**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000641
31-DEC-2014
07:45 AM**

CAAP-11-0000641

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

CINDY CHURAN KODAMA, Plaintiff-Appellee,
v.
ALAN HARUO KODAMA, Defendant-Appellant.

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-D NO. 08-1-2862)

MEMORANDUM OPINION
(By: Nakamura, C.J., and Leonard and Ginoza, JJ.)

In this divorce case, Defendant-Appellant Alan Kodama
(Husband) appeals from the "Decree Granting Absolute Divorce and
Awarding Child Custody" (Divorce Decree) entered by the Family
Court of the First Circuit (Family Court).[1]  The Divorce Decree
was entered pursuant to the Family Court's "Findings of Facts and
Conclusions of Law."  The Divorce Decree dissolved Husband's
sixteen-year marriage with Plaintiff-Appellee Cindy Kodama
(Wife), divided the parties' marital assets, awarded custody of
the parties' two minor children, and awarded Wife alimony and
child support.

The primary issue raised by Husband on appeal involves
the Family Court's valuation of Husband's financial services

---

[1] The Honorable Gale L. F. Ching presided over the proceedings relevant
to this appeal.

business.  Husband and Wife each called an expert at trial on the question of the proper valuation of Husband's business, and the Family Court ultimately adopted the valuation recommended by Wife's expert.  On appeal, Husband contends that the Family Court erred by improperly valuing Husband's financial services business.  Husband also contends that the Family Court erred in: (1) awarding Wife $5,000 a month in alimony for five years; (2) holding an additional hearing after the divorce trial to determine Husband's income in rendering its decision on child support; (3) requiring Husband to pay $200,000 to Wife for her equity in a property on Maui awarded to Husband, even though the stipulated valuation of the Maui Property, which the Family Court accepted, showed only negative equity; (4) making an "illusory" award to Husband of his life insurance policy (Policy 80004) that was controlled by Wife; and (5) failing to credit Husband with the value of investment accounts he owned at the date of marriage.

As explained below, with respect to the primary issue raised by Husband on appeal, we conclude that the Family Court did not err in valuing Husband's business.  With respect to the remaining issues, we conclude that the Family Court erred in its decisions regarding the division of the Maui Property, the award of Husband's Policy 80004, and the valuation of the investment accounts owned by Husband at the date of marriage.  We therefore vacate the provisions of the Divorce Decree that relate to, or are affected by our decision regarding, these matters and remand for further proceedings.  We affirm the Divorce Decree in all other respects.

BACKGROUND

I.

Husband and Wife were married on November 20, 1993. They have two children together: Daughter, born in 1995, and Son, born in 2000.  Wife was a "stay at home" mother responsible for the care of the parties' children and household, while Husband was the family's primary income earner.  At the time of their

2

marriage, Husband was an independent contractor for Ameriprise Financial, Inc. (Ameriprise),[2] providing financial advice and services. In 2000, he signed a franchise agreement with Ameriprise and his financial services business, Alan Kodama & Associates, became a franchisee of Ameriprise. Husband's business was successful, and the parties accumulated substantial wealth while married, including their marital home (Marital Home); 50% share in a beach house in Mokulē'ia (Mokulē'ia Property); two condominium units on Kaua'i (Kaua'i Condos 1 and 2 or collectively, "Kaua'i Condos"); a property located in Wailuku, Maui used to service Husband's Maui clients (Maui Property); bank accounts containing substantial sums; security and investment accounts; and life insurance and retirement policies.

A.   Pre-Trial

On September 2, 2008, Wife filed a complaint in the Family Court seeking dissolution of the parties' marriage. Shortly after Wife filed her complaint, Husband moved out of the Marital Home.

In January 2009, Wife found part-time employment as a receptionist at Downtown Dental Associates earning $12 per hour. On May 24, 2010, the parties filed a stipulation regarding child custody and the valuation of the marital real property. The parties agreed that they would share joint legal custody of both children: Husband would assume primary physical custody of Son; Wife would assume primary physical custody of Daughter; and each parent would have reasonable visitation with the child in the primary physical custody of the other parent. The parties also stipulated to the valuation of their marital real property, as follows:

---

[2] Ameriprise Financial, Inc. (Ameriprise) is the successor to various companies, including American Express Financial Advisors Inc. and IDS, with which Husband was involved. For purposes of simplicity, we will use "Ameriprise" to refer not only to Ameriprise but to American Express Financial Advisors Inc. and IDS.

Marital Home -- $1,275,000
Mokulē'ia Property -- $447,500[3/]
Kaua'i Condo 1 -- $92,500
Kaua'i Condo 2 -- $92.500
Maui Property -- $400,000

## B. Trial

A five day trial was held on July 12, 13, 19, 30, and August 27, 2010. The primary disputes at trial were related to the valuation of Husband's financial services business, alimony, and the distribution of the marital assets, particularly the Maui Property. The following pertinent evidence was presented at trial.

### 1. Business Valuation

Husband's financial services business was an Ameriprise franchisee and a sole proprietorship servicing approximately 900 clients on O'ahu and Maui. Through his business, Husband managed approximately $175 million in assets and had six employees. The business regularly had gross income of over $1 million per year.

Husband's business was governed by a franchise agreement between Husband and Ameriprise. Under this agreement, Ameriprise controlled the type of products Husband sold and required Husband to generate a minimum number of financial plans and meet certain client satisfaction ratings. Ameriprise also controlled all advertising done by or for franchisees. Husband received payment from Ameriprise, not directly from his clients, and Husband was required to pay fees to Ameriprise. If Husband stops working as a franchisee of Ameriprise, "he must turnover all original client lists, client data, financial plans and other data base files."

At trial, both parties presented expert testimony regarding the valuation of Husband's business. Wife's expert, Kimo Todd (Todd), valued Husband's business at $1.524 million.

---

[3/] The parties stipulated that the value of the Mokulē'ia Property was $895,000. However, because the parties only owned a 50% interest in the Mokulē'ia Property, the stipulated value has been reduced to reflect the parties' share of the property.

In his analysis, Todd relied upon three prior transactions in which Husband had bought or sold Ameriprise financial services franchisees.  Todd testified that Husband indicated that in determining the purchase and sale price in these transactions, Husband had used a pricing multiplier of 1.45 times gross sales.[4/] Todd utilized a lower pricing multiplier of 1.35 times gross sales to determine the fair market value of Husband's business. According to Todd, the value of Husband's business was basically attributable to client lists and data rather than Husband's personal goodwill.

On the other hand, Husband's expert, Michael McEnerney (McEnerney), claimed that the fair market value for Husband's business was $94,500.  According to McEnerney, the value of Husband's business should be limited to its physical assets because any intangible assets related to the business were attributable solely to Husband's personal goodwill and were therefore not divisible in divorce.

## 2. Alimony

Both Husband and Wife are college graduates.  Husband received his degree in finance and Wife received her degree in interior design.  During the marriage, Wife did not utilize the skills learned in obtaining her degree and was "primarily a stay at home mother."  The parties enjoyed a relatively high standard of living that included numerous trips to the mainland and neighbor islands each year, dining at high-end restaurants, membership at a country club, and the use and enjoyment of a beach house.  Wife did not have limits on her ability to spend for the family or the household.

Wife presented expert testimony from Frances William McRoberts (McRoberts) with regard to her need for alimony. According to McRoberts, Wife would need $9,000 a month in pretax

---

[4/] Todd used the terms "gross sales" and "gross income" interchangeably with respect to the pricing multiplier as his report explaining his valuation analysis applies the pricing multiplier to "gross sales" and "gross income" interchangeably.

dollars to meet her needs and continue a lifestyle similar to the lifestyle she enjoyed during the marriage.

After the parties separated, Wife sought employment and was hired in January 2009 as a receptionist at Downtown Dental Associates making $12 an hour. She was subsequently promoted to Director of Patient Relations and received a raise to $13 an hour. However, Wife had not developed job skills prior the parties' separation that would qualify her for employment at a higher paying job.

### 3. Maui Property

Husband was using the Maui Property as an office to service his Maui clients. The appraisal used to obtain the stipulated value of the Maui Property appraised the Maui Property as residential and valued it at $400,000. However, during her trial preparation, Wife determined that the property was actually zoned commercial and that the property tax assessed value of the property was $959,300. Therefore, Wife sought to have the Maui Property awarded to her, even though it was used by Husband in his business, or to have the Family Court redetermine the value of the property.

### 4. Other Matters

After separating from Wife, Husband gave a female friend $30,000 to "deposit and hold for him." However, Husband's friend spent the money. Although he initially denied giving any money to third-parties to hold in a pre-trial interrogatory, Husband at trial admitted giving his friend the $30,000 to hold for him.

During the trial, discrepancies were revealed regarding the income and expenses Husband had reported in the divorce proceedings. For example, Husband initially denied having a tenant paying rent for use of the Maui Property, but later stipulated to evidence showing that he did have a tenant that paid $500 a month for use of the Maui Property. Husband similarly received income from the rental of the Mokulē'ia Property and the Kaua'i Condos, which he failed to report. In

addition, during the divorce proceedings, Husband increased the debt on the family's home equity line of credit (secured by an asset which Wife was to be awarded) from $147,063 to $215,059 (an increase of approximately $68,000) while allowing his own checking account to grow from $56,240 to $137,830 (an increase of approximately $83,000).

## C. Post Trial

The Family Court entered its Order Re: Trial (Trial Order) on March 31, 2011. In the Trial Order, the Family Court determined that: (1) the value of Husband's business was $1.524 million, (2) the value of the Maui Property was $400,000 as stipulated to by the parties, (3) valid and relevant considerations existed to deviate from the partnership model of property division, and (4) Wife was entitled to $5,000 in alimony per month for five years. The Family Court also determined child custody and educational expenses for the children and ordered the parties "to submit their respective child support request pursuant to the child support guidelines[.]" The Family Court attached Court's Exhibit 1 to the Trial Order, which was a copy of a Property Division Chart submitted by Wife during trial. According to this exhibit, Wife would be granted the Maui Property subject to it's outstanding mortgage of $574,161.63.

Husband moved for clarification of the Trial Order, seeking clarification as to: (1) which party was awarded the Maui Property because the Trial Order did not specifically award the property to either party, but the property was allocated to Wife under the Court's Exhibit 1; (2) whether the Family Court intended to award Policy 80004 to Husband; and (3) the Family Court's determination of the parties' income for purposes of preparing the child support guidelines worksheet. On May 13, 2011, the Family Court filed its "Order Re: Motion for Clarification" (Clarification Order), which: (1) determined that there was "insufficient evidence to render a decision as to child support"; (2) awarded the Maui Property and its associated mortgage debt to Husband and required Husband to pay Wife

7

$200,000 as part of the award; and (3) left the award of Policy 80004 to Husband unchanged.

Pursuant to the Family Court's Clarification Order, a hearing was held on June 1, 2011, to address child support. Over Husband's objection, the Family Court received additional evidence on Husband's income, including business income that had been reported on the parties' joint 2010 federal tax return, which had been filed after the divorce trial. On July 5, 2011, the Family Court adopted Wife's proposal regarding child support and ordered Husband to pay Wife monthly child support of $2,413.

On August 22, 2011, the Family Court issued its Findings of Fact and Conclusions of Law as well as the Divorce Decree. This appeal followed.

STANDARDS OF REVIEW

In reviewing the Family Court's decisions that Husband challenges in this appeal, we apply the following standards set forth by the Hawaiʻi Supreme Court in Fisher v. Fisher, 111 Hawaiʻi 41, 137 P.3d 355 (2006):

A.    *Family Court Decisions*

Generally, the family court possesses wide discretion in making its decisions and those decision will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

B.    *Family Court's Findings of Fact and Conclusions of Law*

The family court's [findings of fact (FOFs)] are reviewed on appeal under the "clearly erroneous" standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

On the other hand, the family court's [conclusions of law (COLs)] are reviewed on appeal *de novo*, under the right/wrong standard. COLs, consequently, are "not binding upon an appellate court and are freely reviewable for their correctness.["]

8

. . . .

C.    *Credibility of Witnesses*

"It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact."

Fisher, 111 Hawai'i at 46, 137 P.3d at 360 (block quote format altered; citations omitted).

DISCUSSION

I. Business Valuation

Husband asserts that his main issue on appeal concerns the Family Court's valuation of his financial services business, Alan Kodama & Associates, an Ameriprise franchisee. Husband contends that the Family Court erred in valuing his business and in distinguishing this case from Antolik v. Harvey, 7 Haw. App. 313, 761 P.2d. 305 (1988). In Antolik, this court adopted the view that the goodwill of the business of a professional that is accumulated during the marriage is marital property and subject to division when it is "true" enterprise goodwill, which is a marketable business asset, but not when it is "personal" goodwill, which is dependent on the continued presence of the professional involved. Antolik, 7 Haw. App. at 317-18, 761 P.2d at 308-09. As explained below, we disagree with Husband's contentions.

Husband and Wife each called an expert to testify regarding the valuation of Husband's business. The methodology used and the opinion on valuation reached by each expert differed dramatically. Husband's expert used an asset-based valuation method in concluding that the fair market value of the business was $94,500. Wife's expert used a market-based approach in concluding that the fair market value of the business was $1,524,000. Each expert explained the basis for his opinion and was subject to thorough cross-examination. After hearing the evidence, the Family Court found Wife's expert to be more persuasive and accepted his valuation of $1,524,000. Given the evidence in the record, the lack of definitive proof on either

9

side, and because the Family Court's decision was largely dependent on its assessment of the credibility of the valuation experts and its weighing of the evidence presented, we affirm the Family Court on this issue. See Fisher, 111 Hawai'i at 46, 137 P.3d at 360.

A.

Todd, Wife's expert, utilized a market-based approach to value Husband's business. Todd focused on three recent transactions in which Husband bought or sold financial services businesses that were Ameriprise franchisees. In 2003, Husband and Tom Lodico (Lodico), purchased a Hilo financial services company from Chuck Lopez (Lopez). In determining the purchase price, the parties utilized a multiplier of 1.45 times the company's gross sales. The sales agreement included a one-year non-competition provision, and Lopez provided little assistance in transitioning his clients to Husband and Lodico. Almost all of Lopez's clients were retained by Husband and Lodico. Husband maintained very little contact with the Hilo clients, and instead hired Barry Mark (Mark) to service the Hilo clients. Despite Husband's failure to build personal relationships with the Hilo clients, when Mark left the Hilo practice without a restriction on competition, Mark was only successful in converting approximately 30% of the Hilo clients to his new business.

In 2007, Husband sold the Hilo practice to David Hall (Hall), utilizing a 1.45 multiplier times gross sales to establish the sales price. The sales agreement included a one year non-competition clause that restricted Husband's ability to solicit or accept business from any of the Hilo clients. Hall purchased the practice sight unseen with little or no client introduction or transfer support. Most of the clients successfully transferred to Hall while no clients subsequently resumed their relationship with Husband.

In 2003, Husband purchased a financial services business on Maui from Dean Badoyen (Badoyen). The purchase price was $450,000, which was established using a 1.45 multiplier times

10

gross sales. The sales agreement included a one year non-competition clause restricting Badoyen from providing financial advisory services within 50 miles of Wailuku, Maui.

Todd also considered succession agreements between Husband and two of his employees. Under these succession agreements, Sandra Yorong and John Araki[5] had the option to purchase Husband's business upon his death, disability, or termination of his affiliation with Ameriprise. Under the agreements, the purchase price was determined by using a 1.5 multiplier times the average gross sales for the three years prior to Husband's death, disability, or disaffiliation from Ameriprise.

Wife introduced evidence indicating that Husband placed little value on personal goodwill in both the Hilo and Maui transactions. For example, in a 2007 tax return with respect to his Hilo practice, Husband amortized $285,000 in "Intangibles" while only amortizing "Goodwill" in the amount of $2,088. With regard to his purchase of the Maui practice, the parties allocated the purchase price as follows:

> Client files, etc. ("Business") -- $449,000.00
> Covenant not to compete -- $1,000.00
> Total -- $450,000.00

In his valuation report, Todd explained his market-based analysis as follows:

> It appears that what determines the value of Ameriprise franchises in Hawaii is the client lists owned by the franchisee company rather than the "personal goodwill" of the advisor. Based on our conversation with [Husband], this seems to be the case for Ameriprise franchises that he purchased and sold. [Husband] indicated that when he purchased the Hilo-based practice (roughly 300 client accounts), all of the transferred clients were retained with normal shrinkage due to causes such as the death of clients. [Husband] also stated that when he purchased the Maui practice (roughly 700 client accounts) all of the transferred clients were retained with normal shrinkage due to causes such as the death of clients. [Husband] also stated that when he eventually sold the Hilo practice in

---

[5] Sandra Yorong has the option to buy the O'ahu portion of Husband's business, while John Araki has the option to buy the Maui portion of Husband's business.

> 2007, all the client accounts were transferred to the buyer with no clients returning to [Husband]. All of the above sales/purchases included some seller provided transition assistance and a one year, non-compete agreement with the buyer following the transfer. Accordingly, Ameriprise practices that have viable client lists are successfully transferable in the [sic] Hawaii.
>
> . . . .
>
> These facts indicate that the value of these Ameriprise practices are grounded in their respective client lists and are easily transferable in orderly sale and transition. As [Husband's] records confirm, we believe the amounts paid by for these Ameriprise practices are allocable predominantly to the value of the transferable client lists rather than personal goodwill.

Todd testified that the franchise relationship between Husband's business and Ameriprise benefitted the business because Ameriprise provided substantial name recognition to clients as well as marketing and advertising. Wife also adduced evidence that Ameriprise apparently imposed surrender charges on its insurance and annuity products and some stock accounts, which would create an impediment to clients following Husband if he quit his Ameriprise franchisee business to work for a competitor. Todd indicated that his adoption of a "more conservative" multiplier of 1.35 (rather than 1.45 used by Husband in his transactions or 1.5 used in the succession agreements) served to exclude Husband's personal goodwill from his valuation of Husband's business. Todd also explained why he believed that, under the circumstances of this case, the market approach was the best approach to use in valuing Husband's business:

> Being that -- in this case, you know, what we're trying to find out is what fair market value is, what -- the amount at which, you know, willing buyers and willing sellers would -- would transact at. And in this case we have three examples not just of, you know, anybody -- any random person out there, but we have three transactions involving [Husband] and his clients. There is no better indication of what -- what the business could be bought or sold for than looking at the actual transactions involving the subject business.

B.

Husband's expert, McEnerney, disagreed with Todd's analysis. According to McEnerney, except for the physical assets of the business, the entire value of Husband's business was based on Husband's personal goodwill. There was no enterprise goodwill attributable to the business or its franchise relationship with Ameriprise. Accordingly, McEnerney utilized the asset-based approach and only considered the value of the physical assets of Husband's business in arriving at a fair market value of $94,500.

C.

Faced with the divergent opinions of the parties' experts, the Family Court chose to credit Wife's expert. The Family Court concluded as follows:

> 8. The Court concludes that the value of [Husband's] financial planning franchise practice depends more on client lists and data than on [Husband's] personal goodwill.
>
> 9. The Court further concludes that based on [Husband's] prior purchase and sale transactions; the fact that a pricing multiplier was used in those transactions and in [Husband's] succession plans; the fact that [Husband's] financial planning practice is a franchise with significant involvement in the practice and controls imposed on [Husband] by the franchisor; that the departure of Barry Mark from the Hilo practice, who without a non-compete and with little involvement by [Husband] in the practice, taking less than 30% of the clients, shows the existence of enterprise goodwill; the dependence on [Husband's] testimony for evidence of client personal goodwill; that the precepts announced in Antolik do not apply to the facts of this case.
>
> 10. The Court further concludes that the proper way to value [Husband's] financial planning franchise practice is to apply a pricing multiple of 1.35 to [Husband's] gross income[6/] from the business.

There is substantial evidence in the record to support the Family Court's ruling. The Family Court considered the credibility of the experts and weighed the evidence presented in reaching its conclusion. We defer to the Family Court's

_____

[6/] As noted, Todd, Wife's expert, used the terms "gross sales" and "gross income" interchangeable. See note 4, supra.

13

assessment regarding these matters and decline to overturn its decision.

D.

We reject Husband's claim that the Family Court erred as a matter of law in failing to apply this court's decision in Antolik. The Family Court concluded that Antolik was distinguishable and did not control the decision in this case.

In Antolik, the husband in a divorce proceeding owned a sole proprietorship chiropractor business. Antolik, 7 Haw. App. at 313, 761 P.2d at 307. This court addressed the question of whether goodwill of the business of a professional that is accumulated during the marriage is marital property. We described goodwill as follows:

> Goodwill is an attribute of a business. An "income-producing entity, regardless of the nature of the business organization, may have an asset of recognized value beyond the tangible assets of such entity, an intangible asset generally characterized as goodwill." Taylor v. Taylor, 222 Neb. 721, 728, 386 N.W.2d 851, 857 (1986). "Goodwill is a marketable and transferable asset." Prahinski v. Prahinski, 75 Md. App. 113, 129, 540 A.2d 833, 841 (1988).

Id. at 317, 761 P.2d at 308 (brackets omitted). We noted that other courts had adopted different views on whether the goodwill of a business constitutes marital property. We generally adopted the view that "distinguishes between true goodwill [(also know as enterprise goodwill)] which is a marketable business asset and the goodwill which is dependent on the continued presence of the professional involved. The former constitutes marital property, while the latter does not." Id. at 317-18, 761 P.2d at 308-09.

In Antolik, we concluded that the family court did not err in accepting the valuation of husband's expert, which was based on adjusted book value, over the valuation of wife's expert, which was based on an estimate of future earnings. Id. at 315-16, 321, 761 P.2d at 307, 311. However, we made clear that "[w]hether the intangible assets of the business of a professional constitute true goodwill or not should be determined by the trier of fact on a case-by-case basis." Id. at 318, 761

14

P.2d at 309. We also did not mandate that a particular approach be used in valuing a closely-held business, but made clear that different approaches or a combination of approaches could be used. We stated:

> Whatever approach or combination of approaches is used to support an amount, it must always be remembered that (1) in divorce cases the sole object of the exercise is to determine the [fair market value] of the business on the relevant date and (2) absent special circumstances, the value of a sole proprietorship professional business does not include, and must be separated from, the value attributable to the sole professional who operates it.

Id. at 319, 761 P.2d at 309.

Thus, Antolik simply established a rule that a spouse's personal goodwill is excluded in determining the value of a business that is subject to division as marital property. It did not decide whether, or the extent to which, personal goodwill was a component of the value of particular businesses. Contrary to Husband's suggestion, Antolik does not mandate that a particular valuation method be used. Nor does it hold that the intangible assets or goodwill associated with a sole proprietorship professional business are necessarily or significantly personal goodwill. Instead, we concluded in Antolik that "[w]hether the intangible assets of the business of a professional constitute true goodwill or not should be determined by the trier of fact on a case-by-case basis." Id. at 318, 761 P.2d at 309.

Here, Wife's expert and the Family Court were aware of the distinction made in Antolik between enterprise or true goodwill and personal goodwill. Wife's expert explained: (1) why he believed that Husband's personal goodwill was not a significant factor in the value of Husband's Ameriprise franchisee business; (2) why he believed the value of the business was basically derived from its ownership of client lists and data; (3) and how his use of a conservative multiplier served to exclude Husband's personal goodwill from the expert's valuation of the business. Wife's expert also explained why his method of valuation properly captured the fair market value of

Husband's business for purposes of the marital property division. Under the particular facts presented, the Family Court chose to credit the opinion of Wife's expert over that of Husband's expert. We conclude that nothing in the <u>Antolik</u> decision precluded the Family Court from making this choice.

II. Alimony

Husband argues that the Family Court abused its discretion in awarding Wife $5,000 per month in alimony for five years. We disagree.

The Family Court's decision to award alimony is guided by the factors enumerated in Hawaii Revised Statutes (HRS) § 580-47(a).[1/] At trial, Wife presented evidence that Husband and Wife

---

[1/] At the time relevant to this case, HRS § 580-47(a) (2006) provided in relevant part:

> Upon granting a divorce, . . . the court may make any further orders as shall appear just and equitable . . . (2) compelling either party to provide for the support and maintenance of the other party . . . . In making these further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case. . . .
>
> In addition to any other relevant factors considered, the court, in ordering spousal support and maintenance, shall consider the following factors:
>
> (1) Financial resources of the parties;
>
> (2) Ability of the party seeking support and maintenance to meet his or her needs independently;
>
> (3) Duration of the marriage;
>
> (4) Standard of living established during the marriage;
>
> (5) Age of the parties;
>
> (6) Physical and emotional condition of the parties;
>
> (7) Usual occupation of the parties during the marriage;
>
> (8) Vocational skills and employability of the party seeking support and maintenance;
>
> (9) Needs of the parties;
>
> (10) Custodial and child support responsibilities;

(continued...)

enjoyed a high standard of living during their sixteen-year marriage; that Husband had a successful financial services business and a high capacity for earning substantial income in the future; and that Wife's future employment prospects and ability to earn substantial income were limited. Wife also called McRoberts, an expert on alimony, who examined Wife's income from employment and her projected expenses and opined that Wife would need approximately $9,000 before taxes per year to maintain a lifestyle similar to that which she enjoyed while married. McRoberts opined that Wife should receive $9,000 per month in alimony for eight years. McRoberts' alimony analysis did not consider amounts necessary to provide for maintenance of the Marital Home or to pay for the children's private school tuition. McRoberts also admitted that an unequal distribution of the marital assets in the amount of $520,000 in Wife's favor may relieve Wife's need for alimony.

Husband argues that the Family Court's disproportionate award of the marital estate in favor of Wife and the substantial assets she received show that the Family Court erred in its award of alimony. We are not persuaded.

The Family Court found as follows:

> 163. That during the marriage, the parties enjoyed a relatively high standard of living . . . .
>
> . . . .
>
> 167. That [Wife] is unlikely to obtain employment that will generate sufficient income to meet her needs at the marital standard of living.

---

1/ (...continued)

(11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;

(12) Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made;

(13) Probable duration of the need of the party seeking support and maintenance.

. . . .

169. That based on the parties' tax returns, [Husband] generates sufficient income to satisfy his needs and also pay [Wife] alimony.

170. That taking into account [Husband's] current expenses and income, as well as his child support responsibilities, [Husband] has sufficient resources to pay [Wife] $5,000.00 per month in alimony.

171. That based on [Husband's] abilities, resources and assets to be awarded to him, [Husband] should be in a position to accumulate substantial assets in the future.

172. That there is little likelihood that [Wife] will advance further in her employment and that [Wife] will need all the resources to be awarded to her to maintain her standard of living.

173. That taking into account [Wife's] needs, her current earnings and assets to be awarded to her, the Court finds that [Wife] will need $5,000.00 per month in alimony to meet her needs for five (5) years.

. . . .

209. The Court accepts Mr. McRobert's opinions and finds that [Wife] will need additional income by way of alimony to augment what she earns from her employment and what she may earn from assets awarded to her.

210. That [Wife] will be left in a position that will not provide for her future and well-being unless she is awarded alimony in division of the marital estate.

211. That [Wife] will need $5,000.00 per month for five (5) years to meet her needs.

We conclude that there was substantial evidence to support the Family Court's findings and that these findings were not clearly erroneous. We also conclude that based on the evidence presented and its findings, the Family Court did not abuse its discretion in its decision to award Wife $5,000 in alimony per month for a period of five years. See Sabol v. Sabol, 2 Haw. App. 24, 31-32, 624 P.2d 1378, 1383-84 (1981) (reviewing family court's award of alimony under the abuse of discretion standard).

III. Child Support

After the divorce trial was completed, the Family Court held an additional evidentiary hearing to determine the parties' child support obligations. At the hearing, Wife introduced

18

additional evidence regarding Husband's income, including income reported on their joint 2010 federal tax return filed after the divorce trial. The 2010 tax return showed a substantial increase in Husband's business income over that reported on the parties' 2009 tax return. The Family Court considered Husband's updated income in determining its award of child support, which required Husband to pay monthly child support of $2,413 to Wife.

Husband contends that the Family Court erred in holding an additional hearing after the divorce trial and considering the updated evidence regarding Husband's income presented at the hearing in rendering its decision on child support. We disagree.

We review the Family Court's determination of child support for an abuse of discretion. See Doe v. Doe, 118 Hawai'i 268, 278, 188 P.3d 782, 792 (App. 2008). We find no basis to conclude that the Family Court abused its discretion in rendering its decision on child support. Husband cites no authority to support the basic premise of his argument -- that the Family Court was precluded from holding an additional hearing after the divorce trial to gather evidence relevant to its decision in awarding child support. We also note that the determination of child support is a separate part of the a divorce case from the determination of alimony. See Eaton v. Eaton, 7 Haw. App. 111, 118-19, 748 P.2d 801, 805 (1987). We therefore disagree with Husband that the determination of child support must be based on the same evidence used to determine alimony. We affirm the Family Court's child support award.

IV. Maui Property

A.

Prior to trial, the parties stipulated to the valuation of the Maui Property as $400,000. The appraisal used to obtain the stipulated value of the Maui Property appraised the Maui Property as residential. However, in preparing for trial, Wife discovered that the Maui Property was zoned commercial and that the property tax assessed value of the property was $959,300.

19

Wife asked the Family Court to award the Maui Property to her, or alternatively, that the Family Court redetermine the value of the property to more accurately reflect its actual value.

In the Trial Order, the Family Court refused to change the value of the Maui Property from the parties' stipulated value because the "Stipulation was not set aside and remained as is at trial although [Wife] later disputed [the Maui Property's] value." In its Clarification Order, the Family Court awarded the Maui Property and its outstanding mortgage of $574,161.63 to Husband, but also ordered Husband to pay Wife $200,000.[8]

In its findings of fact, the Family Court found:

> 215. The Court finds the value of [the Maui Property] to be $400,000.00 and the balance of the mortgage to be $574,161.63 and awards that property and debt to [Husband], subject to [Husband's] payment of $200,000.00 cash to [Wife] within ninety (90) days after the entry of this decree for [Wife's] interest in the property.

> 216. The Court finds [Wife], at trial, disputed the stipulated value of that property claiming it was under appraised.

> 217. The property was appraised as residential not commercial property.

> 218. That [Husband] admitted the property was used for commercial purposes and had leased part of it out.

In the Divorce Decree, the Family Court further explained:

> The commercial real property of the parties located . . . [in] Wailuku, Hawaii [(the Maui Property)], currently held by [Husband] in his revocable living trust, is awarded to [Husband's] trust as his solely held property as Tenant in Severalty. . . .

> [Husband] shall pay to [Wife] the sum of TWO HUNDRED THOUSAND AND NO/DOLLARS ($200,000.00) within three (3) months of the effective date of this Divorce Decree, which sum represents payment in full for [Husband's] purchase of

___

[8] Specifically, the Clarification Order provides:

The Maui Commercial Property shall be given to [Husband] who shall be responsible for all debts. In addition, [Husband] shall pay [Wife] the sum of $200,000.00 within ninety (90) days unless extended by mutual agreement by the parties once the divorce is final.

and [Wife's] release of, the full present value of [Wife's] current equity interest in the subject property.

B.

Husband argues that the Family Court erred in requiring him to pay $200,000 to Wife for her "equity interest" in the Maui Property, when the stipulated valuation of the Maui Property, which the Family Court accepted, showed only negative equity. We agree.

The Family Court's findings are internally inconsistent. Based on the parties' stipulation, the Family Court found that the value of the Maui Property was $400,000. The Family Court also found that the Maui Property was subject to a $574,161.63 mortgage, which would mean that the parties' equity in the property was a negative $174,161.63. Based on these findings, there was no positive equity interest held by Wife to distribute and no basis for the Family Court to require Husband to pay $200,000 to Wife to compensate her for her "current equity interest in the subject property."[2/]

Wife suggests that the Family Court's decision in dividing the Maui Property can be justified as an equalization payment resulting from the Family Court's deviation from marital partnership principles. However, the Family Court did not justify its decision in dividing the Maui Property as a deviation from marital partnership principles, and we decline to uphold the Family Court's decision on this basis. We vacate the portion of the Divorce Decree that divided the Maui Property and required Husband to pay Wife $200,000 for her "equity interest." On remand, the Family Court may consider all the issues related to the Maui Property as it deems necessary.

_____

[2/] The Family Court's actions would make sense if the Family Court adopted the property tax appraised value rather than the stipulated value as the value of the Maui Property. Using the property tax appraised value would have left approximately $385,000 in positive equity to divide between the parties. The Family Court, however, did not set aside the parties' stipulation as to the value of the Maui Property and instead adopted the parties' stipulated value as the value of the Maui Property.

V. Life Insurance Policy 80004

The Family Court awarded Policy 80004 to Husband as an asset worth $53,627.66. Policy 80004 insured Husband's life only and had a cash surrender value of $53,627.66.[10] Husband argues that the Family Court's award of Policy 80004 to him was "illusory" and that the policy has no value to him because it is owned by an irrevocable trust, over which Wife is sole trustee, the irrevocable beneficiaries of the policy are his Wife and children, and Husband has no control over any cash proceeds. Wife responds to Husband's argument by contending that it "is not supported by any case law, fact or logical argument," but Wife does not explain why Husband's argument is wrong. We conclude that under the circumstances presented, the Family Court's award to Husband of Policy 80004, over which he is unable to exert any control, was indeed illusory and constituted error. We therefore vacate the Divorce Decree to the extent that it awarded Policy 80004 to Husband and assigned the value of Policy 80004 to Husband in its property division calculation.

VI. Husband's Pre-Marital
Investment Account Holdings

Husband argues that the Family Court erred in failing to credit him with the value of investment accounts he owned at the date of marriage as part of his capital contribution to the marital partnership. Husband was unable to present evidence of the precise value of his investment accounts on November 20, 1993, the date of marriage. However, he presented evidence of his account balances at the end of 1993 and his account transactions during that year, and he explained how he used the available account information to extrapolate the value of his investment accounts, which he determined to be $169,546 at the date of marriage. The Family Court, citing the lack of documentary evidence showing the specific values for Husband's

---

[10] The Family Court's findings of fact erroneously list the cash surrender value of Policy 80004 as $63,627.66.

account holdings on the date of marriage, concluded that Husband was not entitled to any credit for the value of his investment accounts at the date of marriage. In effect, the Family Court valued the investment accounts Husband owned at the date of marriage at $0.

Although Husband was unable to prove the precise value of his investment accounts on the date of marriage, there was no dispute that he owned investment accounts with substantial value at the date of marriage. We conclude that the Family Court erred in failing to credit Husband with any amount for his investment accounts at the date of marriage. On remand, the Family Court shall use the available evidence to determine a reasonable value for Husband's investment accounts at the date of marriage.

A.

Husband was entitled to reimbursement for capital contributions he made to the marital partnership in the form of pre-martial investment accounts he owned at the date of marriage. See Baker v. Bielski, 124 Hawai'i 455, 459, 248 P.3d 221, 225 (App. 2011) ("[E]ach partner is entitled to be repaid his or her contributions to the partnership property[.]" (internal quotation marks, citation, and block quote format omitted)).

Prior to trial, Wife agreed that Husband "may have owned investment accounts at date of marriage whose value has not yet been established." In a property division chart that Wife attached to her settlement conference statement, Wife proposed that these investment accounts be valued at $157,341.18 at the date of marriage.

At trial, Husband introduced Exhibit 3P, a 46-page exhibit which consisted of (1) a table prepared by Husband showing his proposed valuation at the date of marriage of seven investment accounts he owned and (2) supporting statements from each account. The account statements showed account transactions and balances over a number of years, including the account balance at the end of 1993 (the year of marriage) and account transactions, number of shares, and share prices at various times

23

near to but not on the date of marriage. Husband explained how he used the account statements to extrapolate the number of shares he owned in each investment account and the value of those shares at the date of marriage, in preparing the table showing his proposed valuation of his investment accounts on the date of marriage. The table in Husband's Exhibit 3P valued his investment accounts at the date of marriage at $163,979.20, which Husband amended to $169,546 in his trial testimony. Wife did not dispute the authenticity of Husband's account statements, but objected to Husband's proposed extrapolated valuations because the account statements did not provide the value of the accounts on the date of marriage.

The Family Court found that the account statements did not identify any specific values for Husband's investment holdings as of the date of marriage and that there was no credible evidence of Husband's proposed valuations of his premarital stocks and mutual funds on the date of marriage. The Family Court therefore concluded that Husband failed to introduce sufficient evidence of his premarital securities holdings to justify giving him a capital contribution credit.

B.

The record establishes that there was no dispute that Husband owned substantial investment accounts at the date of marriage. Wife did not dispute the authenticity of the account statements Husband introduced, which showed that his accounts had substantial value both before and shortly after the date of marriage. Indeed, Wife agreed that Husband "may have owned investment accounts at date of marriage," and she proposed a valuation for these accounts as $157,341.18 at the date of marriage in the property division chart she attached to her settlement conference statement.

We conclude that the Family Court erred in relying on Husband's inability to establish the precise value of his investment accounts at the date of marriage to deny Husband any credit for his premarital investment accounts. While the Family

24

Court was entitled to consider the absence of precise valuations in determining a fair valuation for Husband's accounts, it could not use the absence of precise valuations to justify denying Husband any credit for his accounts, and effectively valuing the accounts at $0. The undisputed account statements provided the Family Court with a clear basis for determining a reasonable valuation for Husband's investment accounts. We direct the Family Court on remand to use the available evidence to determine a reasonable value for Husband's investment accounts at the date of marriage.

CONCLUSION

For the foregoing reasons, we vacate the provisions of the Divorce Decree that relate to, or are affected by our decision regarding, the division of the Maui Property, the award of Policy 80004, and the valuation of the investment accounts owned by Husband at the date or marriage, and we remand the case for further proceedings consistent with this Memorandum Opinion. On remand, the Family Court will be entitled to make all necessary adjustments in its property division to address the errors we have determined were made by the Family Court in this appeal. We affirm the Divorce Decree in all other respects.

DATED: Honolulu, Hawai'i, December 31, 2014.

On the briefs:

Peter Van Name Esser
Edward R. Lebb
for Defendant-Appellant

R. Steven Geshell
for Plaintiff-Appellee

Craig H. Nakamura
Chief Judge

Associate Judge

Associate Judge

25